564 A.2d 1314

**Joseph WAREHAM, Appellant,**

v.

**Glenn JEFFES and David Larkin and Gil Walters and Stanley Gabriel and John Stepanik and George Petsock and James Wigton and Joseph Morrash and Robert Maroney and Ronald Marks and William Kelsey and Commonwealth of Pennsylvania, Bureau of Corrections, Appellees.**

**Joseph WAREHAM**

v.

**Glenn JEFFES and David Larkin and Gil Walters and Stanley Gabriel and John Stepanik and George Petsock and James Wigton and Joseph Morrash and Robert Maroney and Ronald Marks and William Kelsey and Bureau of Corrections and Commonwealth of Pennsylvania,**

**Appeal of COMMONWEALTH of Pennsylvania, BUREAU OF CORRECTIONS and Joseph Morrash.**

Commonwealth Court of Pennsylvania.

Argued March 10, 1989.

Decided Sept. 19, 1989.

126

Harry M. Roth, Raynes, McCarty, Binder, Ross & Mundy, and Kevin P. McCarty, Philadelphia, for appellant.

Alexis Barbieri, Deputy Atty. Gen., Norristown, Alton G. Grube, Office of Atty. Gen., Deputy Atty. Gen. and LeRoy S. Zimmerman, Atty. Gen., Philadelphia, for appellees.

Before CRUMLISH, Jr., President Judge,* and COLINS and SMITH, JJ.

COLINS, Judge.

Joseph Wareham (Wareham) appeals from orders of the Philadelphia County Court of Common Pleas dated September 9, 1987. These orders denied Wareham's post-trial motions for judgment *non obstante verdicto,* new trial and delay damages and granted cross-appellants', Joseph Morrash (Morrash) and the Commonwealth of Pennsylvania (Commonwealth), Bureau of Corrections' [1] (Bureau), motion for judgment *non obstante verdicto.* [2]

Wareham was incarcerated at the State Correctional Institute at Dallas, Pennsylvania (SCID) on August 25, 1980, when he was seriously injured during an attack by other inmates.[3] He was taken to Nesbitt Memorial Hospital, Kingston, Pennsylvania, for surgical treatment and following his discharge on September 11, 1980, was transferred to the infirmary of the State Correctional Institute at Pittsburgh, Pennsylvania (SCIP). Wareham received some medical treatment and physical therapy while at the SCIP infirmary prior to his release into the general prison population

---

* This matter was argued before a panel consisting of Judge COLINS, Judge SMITH, and KALISH, Senior Judge. Due to the untimely death of KALISH, Senior Judge, the case was submitted on the briefs to CRUMLISH, Jr., President Judge, for his consideration as a member of the panel.

1. We note that although the caption lists Bureau of Corrections, and in the interest of consistency we will refer to it as such throughout this opinion, the proper title is Department of Corrections.

2. Cross-appellants appeal that portion of the September 9, 1987 Opinion and Order in which the trial court held that cross-appellants were not entitled to sovereign immunity pursuant to the medical-professional exception contained in Section 8522(b)(2) of the Judicial Code, 42 Pa.C.S. § 8522(b)(2).

3. At approximately 8:15 a.m. while walking down stairs on his way to the SCID exercise yard, Wareham was stabbed numerous times. An 8¼" homemade knife remained lodged in his spine at the base of his neck between his shoulder blades and was surgically removed. He sustained paralysis of the lower extremities, loss of bladder control, unequal dilation of his pupils and slight ptosis (drooping) of the left eyelid. (Pennsylvania State Police Initial Crime Report; Nesbitt Memorial Hospital Consultation Record, both dated August 25, 1980.)

on October 24, 1980. The parties dispute what, if any, therapeutic treatment he received after his release. The parties further dispute whether treatment, therapeutic or otherwise, was negligent and/or in violation of his constitutional rights.

Wareham instituted suit on August 14, 1984, against Morrash, as chief health care administrator of the infirmary at SCIP, other prison officials and the Commonwealth.[4] Wareham initially grounded his claims on common law negligence theories alleging violations of his federal civil rights under the Fifth, Eighth and Fourteenth Amendments to the United States Constitution,[5] and 42 U.S.C. § 1983. After Wareham withdrew certain claims and the trial court granted in part cross-appellants' motions for summary judgment, the only issues that remained for trial were: (1) Section 1983 liability against certain individual defendants for alleged inadequate protection; (2) Section 1983 and negligence claims against Morrash for alleged inadequate medical treatment; and (3) vicarious liability against the Bureau and the Commonwealth under the doctrine of respondeat superior for Morrash's alleged negligence.[6] The jury found, via special interrogatories, that Wareham's constitutional rights had not been violated under any of the theories and awarded damages of $260,000 to Wareham against Morrash on the inadequate medical treatment claim. The jury found that Morrash had been negligent and that such negligence caused Wareham to endure unnecessary additional pain and suffering.

Wareham filed post-trial motions seeking a new trial against certain individual defendants, the Commonwealth, and the Bureau on the inadequate protection claims brought

4. The main issues presented were (1) whether the administration at SCID knew or should have known of the alleged threat to Wareham's safety prior to the attack and failed to take adequate measures to protect him; and (2) whether the administration at SCIP failed to provide Wareham with adequate medical or therapeutic treatment.

5. U.S.CONST. amends. V, VIII, XIV.

6. This issue was not submitted to the jury since the Commonwealth agreed it would not contest the vicarious liability issue if the jury found Morrash to be negligent.

under 42 U.S.C. § 1983; judgment n.o.v. or a new trial against Morrash on the claim for inadequate medical treatment under 42 U.S.C. § 1983 and, delay damages. Cross-appellants filed post-trial motions seeking alternatively, a new trial, judgment n.o.v., or to have the verdict molded to reflect the statutory liability limit of $250,000 pursuant to Section 8528(b) of the Judicial Code, 42 Pa.C.S. § 8528(b). By orders dated September 9, 1987, the trial court denied Wareham's post-trial motions and granted cross-appellants' post-trial motion for judgment n.o.v. Hence, these appeals.[7]

The issues Wareham raises in his appeal are whether the trial court erred in granting cross-appellants' motion for judgment n.o.v. in Wareham's claim for negligent medical treatment, holding that he failed to establish each and every element of his negligence claim; and, whether the trial court erred in denying Wareham's motion for judgment n.o.v. in his claim against Morrash for inadequate medical treatment brought pursuant to 42 U.S.C. § 1983. The sole issue cross-appellants raise is whether the trial court erred in refusing to grant summary judgment or direct a verdict in their favor with respect to the issue of sovereign immunity.[8]

In considering a motion for judgment n.o.v., the court must view the evidence received and all reasonable inferences drawn therefrom in a light most favorable to the verdict winner. The court can enter judgment n.o.v. only if no two reasonable persons could fail to agree that the verdict is improper. *Ruparcich v. Borgman*, 119 Pa.Com-

7. The parties initially appealed to the Superior Court which transferred the appeals to this Court pursuant to section 762(a)(7) of the Judicial Code, 42 Pa.C.S. § 762(a)(7). This Court by Order dated April 11, 1988 consolidated the appeals.

8. The trial court issued an Order dated March 3, 1987 denying cross-appellants' motion for summary judgment as to this issue. We note that a trial court's denial of summary judgment or directed verdict is interlocutory and unappealable except by permission. Pa.R.A.P. 312. However, we will address the important underlying issue as though it had been properly framed; i.e. whether the trial court erred in its determination that Morrash was a health care professional within the purview of 42 Pa.C.S. 8522(b)(2).

monwealth Ct. 640, 547 A.2d 1279 (1988); *Northwest Sav. Ass'n v. Distler,* 354 Pa.Superior Ct. 187, 511 A.2d 824 (1986).[9]

The trial court granted cross-appellants' motion for judgment n.o.v. based upon its finding that Wareham failed to sustain his burden of proving a prima facie case of negligence.[10] Specifically, the trial court held that Wareham failed to show that Morrash had a duty under the law to provide the recommended treatment and that he failed to show a sufficient causal connection between the conduct complained of and his injuries. Wareham's theory of negligence against Morrash is based on his negligent administration of medical treatment to Wareham in light of his serious medical needs. The trial court opined that the jury could not and should not have inferred negligence since the evidence was insufficient to conclude that Morrash had a legal duty to provide the treatment Wareham alleged was necessary, that the care requested was necessary, and that the care requested would have alleviated Wareham's pain and suffering.

After an exhaustive review of the evidence, we must disagree with the trial court's conclusion. Morrash testified that as chief health care administrator at SCIP, it was his responsibility to see that health care services were

**9.** Wareham asserts that abuse of discretion is this court's scope of review. However, when considering a motion for judgment n.o.v., this court's scope is very narrow: "we are concerned only with determining whether there was sufficient competent evidence to sustain the verdict, granting the verdict winner the benefit of every reasonable inference reasonably to be drawn from the evidence and rejecting all unfavorable testimony and inferences." *Cabell v. City of Hazleton,* 96 Pa.Commonwealth Ct. 129, 131–32, n. 2, 506 A.2d 1001, 1003, n. 2 (1986). Our scope of review when considering a motion for a new trial is that we will not reverse the trial court's ruling on appeal absent either an abuse of discretion where the ruling turns on the weight of the evidence or an error of law which controlled the outcome of the case. *Id.*

**10.** The elements of a prima facie case of negligence are: (1) a legal duty or obligation to conform to a certain standard of conduct; (2) a failure to conform to that standard; (3) a reasonably close causal connection between the conduct and the resulting injury; and, (4) actual loss or damage. *Farber v. Engle,* 106 Pa.Commonwealth Ct. 173, 525 A.2d 864 (1987).

provided to inmates pursuant to physicians' orders whether those services were provided inside or outside of the institution.[11] (Notes of Testimony (N.T.) March 4, 1987 at 36–44; N.T. March 6, 1987 at 15.) When asked whether anyone ever ordered that Wareham be given physical therapy when he came to SCIP in September of 1980, Morrash responded, "As far as I know, I don't have his records, his hospitalization records from 1980 when he came here. They disappeared here. I don't know where they went. They went somewhere." (N.T. March 4, 1987 at 40.) He admitted, however, that based upon his thirty-seven years of experience, the types of injuries Wareham sustained would require physical therapy. (N.T. March 4, 1987 at 41.)

Wareham submitted a report prepared by Mr. Carriglitto, chief health care administrator at SCID, which was prepared in conjunction with Wareham's transfer from Nesbitt Hospital to SCIP's infirmary. The report, dated September 9, 1980, indicated that long-term rehabilatory care including intensive physiotherapy was indicated. This recommendation was made pursuant to the direction of P. Holleran, M.D., prison physician at SCID. Wareham also presented a report prepared by Yoon Jin Chung, M.D., a psychiatrist to whom SCIP prison officials sent him for evaluation. This report was in the form of a letter dated October 17, 1980 directed to Dr. Gilberti at SCIP. This report contained diagnoses of conditions which Dr. Chung found to be present in Wareham as a result of the stabbing, as well as a recommendation for daily physical therapy for ambulation training. Dr. Chung's prognosis was that Wareham would be able to ambulate with a cane after intensive physical therapy for four weeks on either an in-patient or daily out-patient basis. Finally, Wareham submitted a commutation physical examination report, dated December 5, 1980, prepared by A.J. Snitzer, M.D. at SCIP in which Dr. Snitzer recommended that Wareham receive some rehabilitation.

11. Morrash testified further that prison physicians were responsible for making therapeutic decisions regarding physical therapy and that if the necessary care could not be provided at SCIP, it would be provided through an outside facility.

Wareham's expert witness, Bruce Wilder, M.D., a neurosurgeon, testified that based upon his own examination of Wareham in addition to records received from Nesbitt Hospital, he would have prescribed gait training to help with walking, climbing stairs, turning, and descending stairs. He also testified he would have prescribed passive exercises to prevent contractures of the joints because in individuals suffering from partial paralysis, the muscles are unable to move the joint through its full range due to their weakness.[12]

Morrash testified that according to Mr. Campeau, a Licensed Physical Therapist at SCIP, Wareham was seen a total of nine times by Mr. Campeau. However, Wareham testified that he had received no actual physical therapy whatsoever since his release from the SCIP infirmary on October 24, 1980. Wareham also challenged the accuracy of the number of visits Mr. Campeau had recorded. Morrash testified the usual and customary practice for someone treating a patient would be to make a notation in the file each and every time the patient is seen. (N.T. March 6, 1987 at 41.) There were a total of three notations contained in Wareham's medical file written by Mr. Campeau.[13] Wareham testified that one of the visits consisted of an informal observation in the prison exercise yard. Cross-ap-

12. Contracture is defined as the drawing together of the muscles or the shortening of the tendons resulting in deformity. Dr. Wilder emphasized the importance, where there is not complete paralysis, of strengthening the muscles and encouraging as much movement as possible. He testified that he agreed generally with Dr. Chung's recommendations, however, in his opinion physical therapy three times a week would have perhaps been sufficient as well. He testified that the type of therapy that Dr. Chung had suggested would usually mean about an hour or two hour session a day working with a physical therapist under the supervision of a physiatrist in trying to improve the level of functioning and prevent complications that might occur from this type of injury. (Deposition taken February 4, 1987, pp. 36–39.)

13. One of these dated 11–18–80 indicated Wareham "was seen for evaluation of AKO (brace)." Another entry, dated 12–11–80 indicated Wareham was seen by Mr. Campeau "on many occasions for the purpose of evaluation of his status [with] regard to physical therapy." The last entry, dated 12–18–80 indicates Wareham was seen for reevaluation.

pellants presented no testimony as to the nature or kind of physical therapy that Mr. Campeau allegedly administered to Wareham and Morrash testified that he was never present when physical therapy was given. (N.T. March 4, 1987 at 44.) Wareham's mother testified she spoke to Morrash about the provision of a wheelchair for Wareham's use and an egg crate mattress to help alleviate problems he was having with bedsores. Morrash refused to provide these items based on alleged budgetary restrictions. She testified that she then offered to provide these items at her own expense, but was told by Morrash that this would not be acceptable. (N.T. March 3, 1987 at 10.) [14]

Additionally, Wareham testified that upon his discharge from SCIP's infirmary October 24, 1980, he was taken by wheelchair to the "hole" (solitary confinement), picked up off the wheelchair by guards and thrown onto a mattress to remain there for six days during which time he received no medical treatment whatsoever.[15] He testified it was cold, conditions were filthy, and that he was not permitted to have a blanket, nor permitted to shower. He further testified that he was unable to get out of bed except to go to the bathroom, which he accomplished with extreme difficulty. (N.T. March 2, 1987 at 70–82.) Wareham maintains that Morrash was negligent in permitting him to receive such treatment in light of his medical condition at the time. Wareham argues that there was no need to establish by expert testimony that this manner of treatment after his recent hospitalization and surgery was contraindicated.

Wareham asserts that it is within the knowledge and expertise of a lay person to be able to determine whether Morrash's conduct, as a health care administrator, was reasonable or adequate and, hence, expert testimony on this

14. Wareham testified he did have access to a wheelchair which was used by paraplegics and quadraplegics to take their showers in at the prison and that he could use the wheelchair as long as no one needed a shower.

15. The testimony is unclear as to why this punishment was imposed. Wareham testified that two days prior, he had had an argument with Morrash over the adequacy of the treatment he was receiving. (N.T. March 2, 1987 at 67, 76.)

issue was unnecessary to aid the jury in reaching its decision. The trial court generally agreed with Wareham's position but concluded that the medical facts in this particular case were too complex to permit the inference by the jury that Morrash's conduct resulted in additional pain and suffering to Wareham without the aid of expert testimony. We disagree. Morrash admitted that based on his experience injuries of the severity Wareham sustained would normally require physical therapy. Cross-appellants presented no evidence of exactly what, if any, therapy was administered to Wareham after his release from SCIP's infirmary. We conclude that the direct testimony in combination with the documentary evidence provided a sufficient basis upon which the jury could have reasonably concluded that Morrash had a duty to provide reasonable medical care to Wareham, and that he knew or should have known that the therapy being provided was not sufficient.

Additionally, the trial court concluded that Wareham failed to prove that the requested medical care was necessary and that the lack of that medical care unnecessarily exacerbated his pain and suffering during his recuperation. We respectfully disagree with the trial court's conclusion. The court cites *Hamil v. Bashline*, 481 Pa. 256, 392 A.2d 1280 (1978), in support of its conclusion that "[w]here a plaintiff alleges that certain medical treatment and therapeutic equipment is necessary to his care, we are reluctant to allow the jury to measure the reasonableness of the requested care by the plaintiff's assertion of necessity alone." (Trial court's opinion at 11.)

The *Hamil* court held that while normally a plaintiff may prove causation with any direct or circumstantial evidence tending to show that defendant's actions were the legal cause of his harm, if the ultimate determinations are beyond the knowledge or expertise of the average lay person, then expert testimony is permitted and is sometimes required to aid the jury in its understanding. The court acknowledged that while generally when the complexities of the human body are involved expert testimony is required

to aid the jury in reaching conclusions as to the cause of pain or injury, there are certain situations involving physical injury where it is possible for the jury to reasonably infer causation from the circumstances of an occurrence or accident.

The jury in the instant matter was presented with the question of whether Morrash's failure to provide reasonable treatment and care resulted in additional pain and suffering. It is generally a matter of common knowledge that rehabilitative therapy is employed to aid an injured individual in recovering from serious disease or injury. Dr. Wilder indicated in his deposition testimony that physical therapy would be a means to try to improve a person's level of functioning and to prevent complications that might occur from the type of injury Wareham sustained. Wareham testified that he suffered from bedsores and was unable to ambulate for a period of weeks without the use of a wheelchair. Additionally, he testified of his six-day confinement in the solitary cell under adverse conditions during the time when he was to have been receiving rehabilitative therapy. We believe that expert testimony was not required in the instant matter and that the jury was capable through its every day experience and knowledge of comprehending the facts presented and drawing conclusions based on those facts.[16] Therefore, we conclude that Wareham met his burden of proof on the prima facie elements of duty and causation and that the trial court improperly granted judgment n.o.v. in favor of cross-appellants.

16. The trial court concluded that in order to support his claim for inadequate medical treatment as it related to the six days in solitary confinement, Wareham would have to prove as a material fact that he was discharged prematurely from the prison infirmary or, more specifically, that this treatment was medically contraindicated at the time and therefore negligent. While Wareham presented no expert medical testimony as to whether such treatment was harmful to his progress, we conclude the evidence presented was sufficient to form a basis for the jury's resolution. As noted by the trial court, "a reasonable person could easily find that even a healthy prisoner would have pain and suffering as a result of such treatment...." (Trial court's opinion at 13.)

■ Wareham next argues that the trial court erred in denying his motion for judgment n.o.v. as to the 42 U.S.C. § 1983 claim against Morrash. The Supreme Court recently declared in *Will v. Michigan Department of State Police*, —— U.S. ——, 109 S.Ct. 2304, 105 L.Ed.2d 45 (1989) that neither states nor state officials acting in their official capacities are "persons" within the meaning of Section 1983.[17] The instant action was brought against Morrash and each of the other named defendants individually and in their official capacities. Pursuant to *Will*, the following analysis deals solely with the Section 1983 action against Morrash individually.

Wareham asserts that because the jury's response to special interrogatory No. 7 was contrary to the uncontradicted evidence and to cross-appellants' admission that Morrash was an employee, agent or officer of the Commonwealth, that he is entitled to the entry of judgment n.o.v. The Supreme Court in *Parratt v. Taylor*, 451 U.S. 527, 101 S.Ct. 1908, 68 L.Ed.2d 420 (1981), *overruled on other grounds, Daniels v. Williams*, 474 U.S. 327, 106 S.Ct. 662, 88 L.Ed.2d 662 (1986), stated the two essential elements in a Section 1983 action: (1) whether the conduct in question was committed by a person acting under color of state law; and (2) whether the conduct deprived the person of rights, privileges, or immunities guaranteed by the Constitution or laws of the United States.

At issue are special interrogatories Nos. 6, 7, and 8 on the verdict slip which required the jury to make factual findings upon Wareham's Section 1983 claim against Morrash.[18]

17. The Court noted the exception that when sued for injunctive relief, a state official in his or her capacity would be a person under Section 1983 because such an action for prospective relief is not treated as an action against the state. *Id.* at —— n. 10, 109 S.Ct. at 2311–12 n. 10.

18. These interrogatories and answers thereto are as follows:
6. Do you find that defendant, Joseph Morrash, was deliberately indifferent to a serious medical need of [Wareham] after he arrived at [SCIP]?
Yes _x_ No ___
If you answered "Yes" to No. 6, go directly to No. 7. If you answered "No" go to No. 9.

Question No. 7 was originally drafted by the court to read "Do you find that defendant Morrash was acting within his *lawful* authority under state law? ... If you answered 'No' to No. 7, go directly to No. 8. If you answered 'Yes' go to No. 9." (Emphasis added.) Wareham objected to the language of this version of the question, which objection was sustained. The word "lawful" was removed from question No. 7 and the position of "Yes" and "No" in the instruction on how to proceed was reversed. (N.T. of March 9, 1987 at 37–44.) Wareham now argues that the jury's response to interrogatory No. 7 was against the weight of the evidence and was incorrect as a matter of law.

A defendant in a Section 1983 action must have exercised power granted by state law and made possible only because the wrongdoer is clothed with the authority under state law. *West v. Atkins*, 487 U.S. 42, 108 S.Ct. 2250, 101 L.Ed.2d 40 (1988). It has been established that a prison official acting in his official capacity is acting under color of state law. *Parratt.* Further, it was uncontested that Morrash was an agent, servant and employee of the Bureau of Corrections, Commonwealth of Pennsylvania, that he was employed at SCIP in the capacity of chief health care administrator and that he was responsible for the overall operation and administration of the infirmary. Consequently, Wareham requested that a binding instruction be given to the jury that at all relevant times Morrash was acting under color of state law. The trial court refused this request. Wareham indicated that the purpose of amending interrogatory No. 7 was to have the jury make a factual determination as to whether Morrash was acting in his capacity as an agent of the state and not to decide the

7. Do you find that defendant Morrash was acting within his authority under state law?
Yes ___ No _x_
If you answered "Yes" to No. 7, go directly to No. 8. If you answered "No" go to No. 9.
8. Do you find that such conduct was a substantial factor in bringing about [Wareham's] harm?
Yes ___ No ___

legal conclusion as to whether his action was *authorized* by
the state. We agree with Wareham's assertion that the
jury's response to interrogatory No. 7 was incorrect as a
matter of law. However, we affirm the trial court's denial
of Wareham's motion for judgment n.o.v. on other grounds
as indicated in the discussion which follows.

 A prisoner's allegations of mistreatment
brought pursuant to a Section 1983 action must rise to the
level of cruel and unusual punishment; mere negligence
alone will not suffice. *West.* Solitary confinement alone
does not violate the Eighth Amendment prohibition against
cruel and unusual punishment. U.S.CONST. amend. VIII;
*Buszka v. Johnson,* 351 F.Supp. 771 (1972). Moreover, the
temporary discomfort and inconvenience experienced as a
result of solitary confinement, standing alone, do not raise a
cognizable claim under 42 U.S.C. § 1983. *Id.* While we
have concluded that Wareham has satisfied his burden of
proving negligent conduct by Morrash through his failure
to provide proper treatment and care, we find the trial court
did not err in failing to conclude that his conduct rose to the
level of cruel and unusual punishment.

 In order to set forth a cognizable claim for
inadequate medical care, a prisoner must show deliberate
indifference to serious medical needs such that would of-
fend "evolving standards of decency." *Estelle v. Gamble,*
429 U.S. 97, 106, 97 S.Ct. 285, 292, 50 L.Ed.2d 251 (1976). A
serious medical need has been defined as one so obvious
that a lay person would easily recognize the necessity for a
doctor's care. *Farmer v. Carlson,* 685 F.Supp. 1335 (1988).
Even though the parties do not agree upon what constituted
proper medical treatment, this alone is not sufficient to
support a constitutional violation. *Id.* A complaint that a
health care professional has been negligent in the diagnosis
or treatment of a medical condition does not state a valid
claim of medical mistreatment rising to the level of cruel
and unusual punishment under U.S.CONST. amend. VIII.
*Estelle.* Medical malpractice does not become a constitu-

tional violation merely because the victim is a prisoner. *Id.* 429 U.S. at 106, 97 S.Ct. at 292.

In *Estelle,* a prisoner brought a Section 1983 action against the State Correctional Department's medical director and two correctional officials claiming inadequate medical treatment for a lower back injury he had sustained. As in the instant matter, the prisoner had received some medical care but disputed the adequacy of it. The court held that a question of whether x-rays or additional diagnostic techniques or forms of treatment are indicated is a matter for medical judgment. It further held that the failure to provide certain treatments does not represent cruel and unusual punishment but at most is medical malpractice.

We now turn to the cross-appellants' contention. Cross-appellants assert that the trial court erred in its conclusion that sovereign immunity was waived under the medical-professional exception provided in Section 8522(b)(2) of the Judicial Code, 42 Pa.C.S. § 8522(b)(2). That section provides:

> (b) *Acts which may impose liability.*—The following acts by a Commonwealth party may result in the imposition of liability on the Commonwealth and the defense of sovereign immunity shall not be raised to claims for damages caused by:
>
> . . . .
>
> (2) *Medical-professional liability.*
>
> —Acts of health care employees of Commonwealth agency medical facilities or institutions or by a Commonwealth party who is a doctor, dentist, nurse or related health care personnel.

Cross-appellants argue that SCIP is not a Commonwealth agency, medical facility or institution and cite *Steinberg v. Department of Public Welfare,* 46 Pa.Commonwealth Ct. 105, 405 A.2d 1135 (1979), in support thereof. Therein, an employee of a youth detention center brought suit against

the Commonwealth, an administrator, and a counsellor, among others, for liability stemming from a sexual assault by one of the student prisoners. This Court concluded that the youth detention center was not a medical facility or institution within the meaning of 42 Pa.C.S. § 8522(b)(2) because its purpose was the rehabilitation of minors. In construing the term health care personnel, this Court examined the functions that each of the defendants performed and concluded that social workers, counsellors and administrators at youth detention centers are not related health care personnel.

We agree with the trial court in the instant matter that the facts in *Steinberg* lend little support for cross-appellants' argument. We further agree that while the function of a prison is certainly similar to that of a youth detention center, the function of the prison infirmary clearly is to deliver medical care to the inmates and is therefore distinguishable from the prison as a whole. Additionally, Morrash's uncontested testimony indicated that his function as chief health care administrator encompassed providing health care services to inmates pursuant to physicians' orders. Therefore, we find the trial court properly classified the prison infirmary as a medical facility and Morrash as a health care employee or related health care personnel and properly determined that sovereign immunity was waived under 42 Pa.C.S. § 8522(b)(2).

Accordingly, the order of the trial court dated September 9, 1987, which granted cross-appellants' motion for judgment n.o.v., is reversed and the jury's verdict is reinstated.[19] The trial court's order of September 9, 1987, which denied Wareham's post-trial motion for judgment n.o.v., is affirmed.

## . ORDER

AND NOW, this 19th day of September, 1989, the order of the Philadelphia County Court of Common Pleas dated

---

**19.** We direct that the verdict be molded to conform to the statutory limitation of $250,000 pursuant to Section 8528(b) of the Judicial Code, 42 Pa.C.S. § 8528(b).

September 9, 1987, which granted cross-appellants' motion for judgment n.o.v., is reversed. The order of the Philadelphia County Court of Common Pleas dated September 9, 1987, which denied Wareham's post-trial motion for judgment n.o.v., is affirmed.

We direct that the verdict be molded to conform to the statutory limitation of $250,000 pursuant to Section 8528(b) of the Judicial Code, 42 Pa.C.S. § 8528(b).